# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED
Sep 24, 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SEALED

United States of America
v.

JAYDEN VIRGIL THOMAS

*Defendant(s)*

Case No. 2:26-mj-00142 CSK

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of June 21, 2026 in the county of Sacramento in the Eastern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| **18 U.S.C. § 2252(a)(2)** | **Distribution of Child Pornography** |

This criminal complaint is based on these facts:

See Affidavit of HSI Special Agent Casey J. Snyder, attached hereto and incorporated by reference.

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Casey Snyder, HSI Special Agent
*Printed name and title*

Sworn to me and signed via telephone.

Date: September 24, 2026

Chi Soo Kim
*Judge's signature*

City and state: Sacramento, California

Chi Soo Kim, U.S. Magistrate Judge
*Printed name and title*

**CONTENTS**

I. AFFIDAVIT ....1

II. INTRODUCTION ....1

III. AGENT BACKGROUND ....2

IV. APPLICABLE STATUTES ....3

V. DEFINITIONS ....3

VI. PROBABLE CAUSE ....5

A. Probable cause that THOMAS possesses CSAM ....5

B. Probable cause that THOMAS resides at 9033 Williamson Ct, Sacramento, CA ....9

C. Probable cause that THOMAS is using the Target Cell Phone ....11

VII. CHARACTERISTICS COMMON TO INDIVIDUALS WHO SOLICIT, RECEIVE, AND/OR PRODUCE CHILD PORNOGRAPHY ....12

VIII. BACKGROUND ON COMPUTERS AND CHILD SEXUAL ABUSE MATERIAL ....13

IX. INFORMATION ABOUT THE SEARCH AND SEIZURE OF COMPUTER SYSTEMS AND RELATED STORAGE MATERIALS ....15

X. SPECIFIC METHODS FOR SEARCH OF DIGITAL DEVICES ....19

XI. REVIEW PROTOCOL FOR COMPUTERS ....25

XII. AUTHORIZATION REQUEST WITH REGARD TO THE SEARCH OF THOMAS'S PERSON AND RESIDENCE ....27

XIII. AUTHORIZATION REQUEST REGARDING APPLICATION FOR WARRANT TO OBTAIN PRECISE LOCATION DATA FROM A CELLULAR PHONE ....28

XIV. CONCLUSION ....30

# I. AFFIDAVIT

I, Casey J. Snyder, being first duly sworn, hereby depose and state as follows:

# II. INTRODUCTION

1. I make this Affidavit in support of applications for the following legal process:

| Attachment | Person / Property | Process Sought |
|---|---|---|
| N/A | Jayden Virgil THOMAS | Complaint & Arrest Warrant |
| A-1 | Jayden Virgil THOMAS | Search Warrant |
| A-2 | 9033 Williamson Court, Sacramento, CA (the "Subject Premises") | Search Warrant |
| A-3 | The Cellular Phone assigned call number 916-504-6449 (the "Target Cell Phone") | Search Warrant (prospective precise location data) |

The subject and property to be searched are further described in Attachments A-1 through A-3. The applications seeks to search them for the things described in Attachment B-1 through B-3. As explained throughout this Affidavit, and specified on the relevant attachments, I believe THOMAS is engaged in violations of 18 U.S.C. § 2252 – receipt, possession, and distribution of child pornography. This Affidavit also supports my application for an arrest warrant for THOMAS for a violation of 18 U.S.C. § 2252 – distribution of child pornography.

2. As to the warrants associated with Attachments A-1 and A-2, this application seeks to search them for the things described in Attachment B-1 and B-2.

3. As to the warrant associated with Attachment A-3, I also make this Affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 916-504-6449 (the "Target Cell Phone"), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. The Target Cell Phone is described herein and in Attachment A-3, and the location information to be seized is described herein and in Attachment B-3. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen

register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. See 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

## III. AGENT BACKGROUND

4. I am a Special Agent with Homeland Security Investigations (HSI) and have been since June of 2022. I have been a Special Agent for over 17 years. Prior to HSI, I was a Special Agent with the U.S. Postal Service, Office of Inspector General and the Air Force Office of Special Investigations. I completed the Criminal Investigator Training Program (CITP) at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, in 2008. Additionally, I have completed various advanced training courses and certifications pertaining to criminal investigations. I completed the HSI Special Agent Training (HSISAT) course at FLETC in December of 2022.

5. I have also gained experience through investigations that I have either led or participated in. These investigations have involved violations of the criminal code including offenses involving child exploitation, production of child pornography, possession/distribution of child pornography, counterproliferation, healthcare and benefit fraud, drug trafficking, production/distribution of fraudulent documents, and national security matters. In the course of my employment, I have applied for, received, and executed many search warrants and arrest warrants.

6. I am a federal law enforcement officer who is engaged in enforcing criminal laws, and I am authorized by law to request and execute search warrants, and to make arrests for violations of federal laws, including child pornography violations.

7. I am familiar with the definition of child pornography as defined in 18 U.S.C. § 2256(2). I have training in identifying visual depictions of minors engaged in sexually explicit conduct pursuant to the definition contained in 18 U.S.C. § 2256(2). In this Affidavit, when I refer to depictions of child sexual assault material (CSAM), I am referring to visual depictions of minors engaged in conduct that constitutes child exploitation material, or child pornography, under the United States Code.

8. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to

show that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## IV. APPLICABLE STATUTES

9. This investigation concerns alleged violations of 18 U.S.C. § 2252 relating to material involving the sexual exploitation of minors.

10. 18 U.S.C. § 2252(a)(2) prohibits the knowing receipt or distribution, by computer or mail, of any visual depiction of minors engaging in sexually explicit conduct, if the visual depiction has been mailed, shipped, or transported in interstate or foreign commerce, or if it contains materials that have been so mailed, shipped, or transported, by any means, including by computer.

11. 18 U.S.C. § 2252(a)(4)(B) prohibits the possession of one or more matters that contain visual depictions of minors engaged in sexually explicit conduct, and that have been mailed, shipped, or transported in interstate or foreign commerce, or if it contains materials that have been so mailed, shipped, or transported, by any means, including by computer.

## V. DEFINITIONS

12. The following definitions apply to this Affidavit and Attachments B1 and B-2:

a) "Child Pornography," or child sexual abuse material (CSAM) as defined in 18 U.S.C. §2256(8), includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction was a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

b) A "computer," as defined in 18 U.S.C. §1030(e)(1), refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

c) "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar

computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

d) "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

e) "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

f) "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g) "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

h) A “minor,” as defined in 18 U.S.C. §2256(1), means any person under the age of 18.

i) “Sexually explicit conduct,” within the meaning of 18 U.S.C. §2256(2)(A), includes actual or simulated (a) sexual intercourse (including genital-genital, oral-genital, or oral-anal), whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person.

j) “Visual depictions,” within the meaning of 18 U.S.C. §2256(5), include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.

k) The terms “records,” “documents,” and “materials” include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (“DVDs”), Personal Digital Assistants (“PDAs”), Multi Media Cards (“MMCs”), memory sticks, optical disks, printer buffers, smart cards, smart phones, iPods and iPads and the like, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## VI. PROBABLE CAUSE

### A. Probable cause that THOMAS possesses CSAM

13. I know, based on my conversation with other law enforcement officers and my review of court records, that THOMAS is currently facing a misdemeanor case in this district related to multiple charges for destruction of government property and assault on a federal officer. *See United States v. Thomas,* Case No. 2:26-CR-0110 AC. Law enforcement arrested THOMAS on June 25, 2026, and seized a phone from THOMAS during that arrest.

14. On July 22, 2026, the FBI received a tip from an individual[1] who reported that THOMAS possessed CSAM. On July 27, 2026, an FBI special agent contacted and interviewed the tipster. The tipster stated s/he learned THOMAS was attracted to children and possessed CSAM on or around July 20, 2026. The tipster provided additional information and images, including the screenshot below from one of THOMAS's Discord accounts:




FIGURE 1: DISCORD SCREENSHOT OF MESSAGE FROM THOMAS PROVIDED BY TIPSTER.

15. On September 9, 2026, the Federal Protective Service (FPS) obtained a federal search warrant for a "Model TCL K33 cellular phone bearing two stickers seized from the person of Jayden THOMAS on June 25, 2026…" to search for evidence of violations of 18 U.S.C. §§ 111, 1361 and 2252(a)(4)(B). The search warrant, case number 2:26-SW-0822 JDP, was authorized by the Honorable Jeremy D. Peterson, U.S. Magistrate Judge, in the Eastern District of California. Law enforcement executed this search warrant on or about September 17, 2026.

16. On September 22, 2026, HSI, Sacramento, received information from FPS, Sacramento, which indicated THOMAS may have received, possessed, and/or distributed CSAM. FPS shared the data obtained from the cell phone with HSI. Consistent with the information provided by the tipster, HSI and FPS conducted a cursory review of the data and observed multiple files which appeared to be CSAM on THOMAS's device. One particular chat group was discovered within the communication application "Signal." This chat group appeared to be named "Honey Cake Buns Fan Club :3" and

[1] This individual claimed to be an ex-partner of THOMAS, who had personal knowledge of two of THOMAS's Discord accounts. S/he reached out on their own to Discord and to the FBI. The FBI did not promise anything of value to the tipster in exchange for the information. The FBI independently verified that the reported Discord accounts were used by THOMAS after reviewing Discord records. According to the FBI Special Agent who followed up on the tipster's information, the tipster appears to have provided reliable information that has been corroborated in this investigation.

consisted of THOMAS and multiple others. In this chat group, members both sent and received CSAM, and discussed various topics, including sexual acts with minors. It is clear from the extracted data that the owner of the phone seized from THOMAS sent the video.

17. The data extracted from the phone's Signal app indicated THOMAS was a member of this chat group between June 18, 2026, and June 25, 2026.[2] In one conversation, on June 19, 2026, user "ALEX" asked "What you all up to?" Various members responded such as "HONEY" who replied, "Horny." User "declanfrankowski" responded, "Eating." "ALEX" stated, "I'm taking advantage of kids on Roblox."

18. On June 19, 2026, at approximately 2:12 a.m. (UTC), "HONEYPIE" asked, "does anybody have baby/toddler anal videos???" User "PCS" stated, "Check your DM's".[3] At approximately 2:31a.m. (UTC) the user named "ALEX" responded, "I haven't seen toddlers video anywhere." Approximately 18 minutes later, "ALEX" distributed multiple CSAM videos into the chat group. One such video was titled, "part1487896795691424707.mms".[4]

19. This video was approximately 3 minutes and 39 seconds in duration. The video depicted what appeared to be a female toddler laying on an open diaper with her genitalia exposed. A black gloved hand inserted a pink object into the child's anus. At approximately 42 seconds into the video, what appeared to be an adult male's penis penetrated the child anally.

20. "ALEX" also distributed another CSAM video named, "part6924277201426193272.mms." This video was approximately 6 minutes and 2 seconds in duration and depicted what appeared to be a female toddler laying nude on her stomach. What appeared to be an adult male used a pink object to penetrate the toddler's vagina. The toddler's feet appeared to be bound with a multi-color rope. The adult male digitally penetrated the toddler's vagina with their finger, then masturbated and ejaculated on the toddler's exposed vagina.

---

[2] The data reviewed indicated this chat group ended on June 25, 2026. As this was the date the device was seized, the chat group may still exist, but has not updated with the device.

[3] Based on my training and experience, I know DM's typically refers to Direct Message, establishing that the individual has personal, or one-on-one contact, with the recipient.

[4] The file names used in this affidavit are based upon a cursory exam and may not reflect the true file names. However, using the names provided in this affidavit law enforcement can locate and produce the files for additional review.

21. On June 19, 2026, at approximately 2:52 a.m. (UTC), user "HONEYPIE" distributed multiple CSAM videos into the chat group.

22. On June 19, 2026, at approximately 1:10 p.m., user "AL" distributed multiple CSAM videos into the chat group.

23. On June 19, 2026, at approximately 1:34 p.m. (UTC), user "RIXI" distributed CSAM into the chat group.

24. On June 19, 2026, at approximately 10:57 p.m. (UTC), THOMAS distributed a CSAM video into the chat group named, "part1756019376823647564.mms." The forensic extraction reveals that this video was distributed by the user of the phone. This video was approximately 44 seconds in duration and depicted what appeared to be a prepubescent male child laying in a chair. The child's ankles are above his head and bound to the chair. The child was blindfolded and a large black object was inside his anus. The child's anus and penis were exposed and what appeared to be an adult male masturbated the bound child.

25. On June 21, 2026, at approximately 7:34 p.m. (UTC), THOMAS again distributed a CSAM video into the chat group named, "part1981148990878886776.mms." This video was approximately 8 minutes and 58 seconds in duration. The video depicted a prepubescent female child, on a bed, wearing a tiger costume. The child orally copulated what appeared to be an adult male. The video then showed the child laying on her back, nude from the waist up, with an adult male straddling her as he masturbated, then ejaculated, on the child's face and chest. Words overlayed on the screen read, "April's first facial." The video then depicted what appeared to be an adult male, fully clothed, but with his erect penis exposed. What appeared to be the same child, was wearing a dress and sitting on the bed, as she orally copulated the male. The video then depicted what appeared to be an adult male masturbating and ejaculating on the same child, as she lay nude on her back. The video then depicted what appeared to be the same child orally copulating an adult male, who was sitting on a toilet. The adult male then stood and forced the child to orally copulate him again. The adult male appeared to ejaculate into the child's mouth, causing her to vomit. The adult male cleaned his penis, then forced the child to further orally copulate him before the video ended.

26. On June 23, 2026, at approximately 5:11 p.m. (UTC) user, "BUTLIKE" distributed a

CSAM video into the chat group named, "part4569350730532761581.mms." This video was approximately 42 seconds in duration and depicted what appeared to be a female toddler standing in the shower. The child was nude, except her eyes were covered with some sort of mask. What appeared to be an adult male stood near the child and placed his erect penis near her mouth. Then the adult male urinated on the child's face and chest. She swatted at his penis and attempted to turn away, but he continued to urinate on the child as she cried.

27. Ongoing reviews of the device have revealed over 100 videos depicting CSAM to be on the device previously controlled by THOMAS (and seized from her during her arrest on the misdemeanor case).

28. I believe, based on my training and experience in CSAM cases, and also based on the fact that the tipster reported in July 2026 (after THOMAS's arrest in the pending misdemeanor case and the seizure of her phone), that THOMAS has additional CSAM in other computers and locations, and that THOMAS likely received and distributed additional CSAM since their arrest on June 26, 2026, and subsequent release.

**B. <u>Probable cause that THOMAS resides at 9033 Williamson Ct, Sacramento, CA</u>**

29. California Department of Motor Vehicles (DMV) records showed THOMAS lists 1821 Helena Avenue, Apartment H, Sacramento, California 95815, as a residential address. This address is also listed as THOMAS's residence on a police report regarding THOMAS's arrest for battery by the CHP on August 26, 2026. In addition, the address on THOMAS's California identification card demonstrates that THOMAS listed this as a residential address on June 29, 2026, after the June 25, 2026 arrest and her subsequent release. However, subsequent investigation revealed that THOMAS's mother likely resides at this address, and that THOMAS resides at 9033 Williamson Court, Sacramento, California, 95826.

30. I believe THOMAS resides at 9033 Williamson Court for a number of reasons discussed below. First, Department of Homeland Security records demonstrate that on or about August 1, 2026, an item described as a "FACE BREATHABLE WINDPROOF MOTORCYCLE HELMET BANDANA CYCLING CAPS SKULL MEN BALACLAVA SKI MASKWHITE" was shipped to 9033 Williamson Court in Sacramento. The shipment was addressed to/destined to, "EMMA." I know that "Emma," or a

variation of that name, is a name used by THOMAS. For example, "Emma" is a first name that THOMAS used when using the jail call system at the Sacramento County jail after the June 25, 2026, arrest.

31. Second, open-source research revealed that the address 9033 Williamson Court in Sacramento, was listed as a care facility on the California Department of Social Services website. The address was listed as an adult residential property, under the phone number 916-316-8882. The licensee name was listed as, "Williamson Communities Corp." The website indicated the residence had a capacity of four individuals. One individual who was listed as a manager and/or director of the facility was J. S.

32. Third, on September 23, 2026, HSI Sacramento identified a publicly available account on the social media platform "X". The account (pictured below) indicated the username was "Jayden Virgil Thomas @emmaaishaleila." The account says, "…I live at 9033 Williamson Ct, Sacramento, CA 95826." Based on a review of data from THOMAS's cell phone, law enforcement records, and THOMAS' California identification card, the individual pictured on the account appeared to be THOMAS.



FIGURE 1: LEFT: SCREENSHOT OF @EMMAAISHALEILA X ACCOUNT. RIGHT: DMV PICTURE TAKEN OF THOMAS ON JUNE 29, 2026.

33. Fourth, I reviewed data and records from Comcast regarding the IP address 67.169.230.13, on dates including July 29, 2026, and July 30, 2026. The data showed that the subscriber

associated with the IP address was J. S., at 9033 Williamson Court, Sacramento, CA 95826. The phone number listed for J.S. was 916-316-8882. Both of these identifiers are the same as the identifiers listed above for Williamson Communities Corp., consistent with the business providing internet access to the residents.

34. Fifth, I also reviewed more data from the cell phone seized from THOMAS on June 25, 2026. In the data, I discovered a list of Wireless Internet connections made by the device. One such connection confirmed that the wireless network name was, “Williamson Communities”. The password for this network was listed as, “9033 Williamson.”

35. Based on these overlapping layers of evidence, I believe THOMAS is currently residing at 9033 Williamson Court in Sacramento.

**C. <u>Probable cause that THOMAS is using the Target Cell Phone</u>**

36. The cellular phone seized from THOMAS on June 25, 2026, was assigned 916-504-6449. This number is the same one provided by the tipster who reported to the FBI that THOMAS had CSAM. I reviewed current T-Mobile records for the account associated with 916-504-6449 (the Target Cell Phone). The records reveal that the subscriber for the Target Cell Phone is and has been E. Thomas, at 1821 Helena Ave, Sacramento, California 95815, since November 10, 2025.

37. I know that E. Thomas is THOMAS’s mother. This connection is based on THOMAS referring to her as “mom” during texts messages, and, while THOMAS was in custody recently, THOMAS called her multiple times over a recorded jail line and their conversations were consistent with E. Thomas being THOMAS’s mother.

38. In addition, I reviewed some of the records for calls made by the Target Cell Phone and found multiple calls to numbers familiar from this investigation, such as THOMAS’s mother on September 20, 2026. This is consistent with THOMAS acquiring a new cellular phone after her cellular phone was seized on July 25, 2026 (and it would be unusual for THOMAS’s mother to be calling herself). Based on these reviews, and my training and experience, I believe THOMAS is still in control of the Target Cell Phone.

## VII. CHARACTERISTICS COMMON TO INDIVIDUALS WHO SOLICIT, RECEIVE, AND/OR PRODUCE CHILD PORNOGRAPHY

39. Based on my training and experience, and that of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who solicit, receive and/or produce images of child pornography:

a. Individuals who solicit, receive, and/or produce child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b. Individuals who solicit, receive, and/or produce child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Individuals who solicit, receive, and/or produce child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d. Likewise, individuals who solicit, receive, and/or produce child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and

private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e. Individuals who solicit, receive, and/or produce child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f. Individuals who solicit, receive, and/or produce child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## VIII. BACKGROUND ON COMPUTERS AND CHILD SEXUAL ABUSE MATERIAL

40. Based on my knowledge, training, and experience in child exploitation and CSAM investigations, and the experience and training of other law enforcement officers with whom I have spoken, I know that computers, computer technology, and the internet are critical components in the production, distribution, and collection of child pornography.

41. A child pornography image or video taken with a digital camera can be transferred directly to a computer, and then transferred from that computer to any other server or computer connected to the internet via modem or wireless connection. Many devices not traditionally thought of as computers, such as video game consoles, smartphones, and digital media players have the ability to store digital data, access the internet, and send or receive digital data electronically.

42. The large storage capacity of current personal computers and external hard drives make them ideal repositories for child pornography. External hard drives with capacities of one or more terabytes are inexpensive and common. A terabyte is one thousand gigabytes. An inexpensive and portable flash drive can contain several gigabytes of data.

43. Child pornography collectors may use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! And Gmail. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

44. Communications made to or from a computer or other digital storage or communications device are often saved or stored on that computer. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer, or by saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication may be automatically stored in many places, such as temporary "cache" folders. In addition to electronic communications, a computer user's Internet activities generally leave traces in a computer's web cache and Internet history files. A forensic examiner often can recover evidence that shows what software a computer contains, when the computer was sharing files, and the contents of some of the files that were uploaded or downloaded.

45. Computer files or remnants of such files can be recovered years after they were viewed, downloaded, or deleted. Deleted files can often be recovered months or years later using readily available forensic tools. This is because a deleted file does not actually disappear; rather, it remains on the computer's hard drive until it is overwritten by new data. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve remnants of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

46. I know from my training and experience that individuals who receive, possess, distribute, and transport child pornography often use the Internet to increase the number of images in their

collection. The Internet provides users with access to websites and social networking sites from which images of child pornography can be downloaded and uploaded. In addition, the Internet allows communications with others who express an interest in child pornography and permits the transfer of data and images across state and foreign boundaries. Individuals who use the Internet can communicate electronically by using e-mail. E-mail messages can contain text, data, or graphic images. This type of communication is private in that it is directed from one Internet user to another. Internet users can also communicate and trade images of child pornography using Instant Messaging. Instant Messaging is "real time" communication in that the persons communicating are engaging in online dialog. This means of communication, like e-mail, is private in that it is one Internet user communicating specifically, and exclusively, with another.

47. Digital evidence of the results of web browsing can often be found on the hard drive of a computer during a forensic examination. In addition, the dialog and image downloads created when corresponding via email and instant message are generally stored in the hard drive of a computer until overwritten by other correspondence, and are usually retrievable during a forensic examination of the computer. This is true, even if the computer user has deleted the data.

## IX. INFORMATION ABOUT THE SEARCH AND SEIZURE OF COMPUTER SYSTEMS AND RELATED STORAGE MATERIALS

48. Based on my own experience and conversations with other agents, I know that information stored in an electronic format may be found not only on the hard disk drive of a computer, but also on other computer hardware, peripherals, and storage media. In addition, to conduct a thorough search of computers, agents are often required to seize most or all of the computer hardware, peripherals, and other storage media, to be searched later by a review team in a controlled environment. This is true for the following reasons:

a) Volume of Evidence: Computers and storage devices (like hard disks, diskettes, tapes, CD-ROMs, DVDs, and zip drives) can store the equivalent of thousands of pages of information. Also when the user wants to conceal criminal evidence, he or she may store it in many places, in random order, and with deceptive file names. This requires the review team to examine all the stored data to determine whether it is included in the warrant. This sorting

process can take several weeks to conduct, and it would be impractical to attempt this kind of data search on site.

b) Technical Requirements: Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment needed to conduct a thorough search. In addition, it may be necessary to consult with personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

c) In order to retrieve electronically stored evidence from a computer, agents may be required to seize most or all of a computer system's equipment, including hardware, peripherals, software, documentation, security devices, and passwords. This is true because of the following:

i. Certain operating systems and hardware can be configured to operate only with a precise set of hardware, software, and peripherals.

ii. Peripheral devices that allow users to enter or retrieve data from the storage devices may vary in their compatibility with other hardware and software.

iii. The review team may have to install software used by the suspect on a government computer in order to retrieve the information the suspect may have stored using that software. The review team may also need to refer to hardware and software documentation maintained by the suspect to complete an analysis in a timely manner. The suspect's computer documentation may also contain hand-written notes specific to the seized computer system.

d) The Nature of Data Storage: Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to

an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or “cache.” The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. The search for these files and file fragments can take considerable time, depending on the computer user’s practices. It often takes weeks or months to complete such a search, particularly if many hard drives and other storage media are seized from the location to be searched. A thorough search for such relevant evidence would be impractical during an on-site preview.

49. As further described in Attachments B-1 and B-2, this warrant seeks permission to locate in the SUBJECT ITEMS not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, and who used them. Additionally, the warrant seeks information about the possible location of other evidence, or about persons who may know things helpful to the investigation at issue.

50. Further, as described above and in Attachments B-1 and B-2, this application seeks permission to search and seize records that might be found on the SUBJECT ITEMS, in whatever form they are found. One form in which the records might be found is that they are stored on a computer’s hard drive, or other electronic media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis of the computer(s) or other electronic storage media seized.

51. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer hard drives can contain other forms of electronic evidence as well. In particular, records of how a computer has been

used, the purposes for which it was used, and who has used it are called for by this warrant. As described above, data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the hard drive that show what tasks and processes on the computer were recently in use. Web browsers, e-mail programs, and chat programs store configuration information on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals (e.g. Cameras and printers for creating or producing images), the attachment of USB flash storage devices, and the times and dates the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can sometimes be evidence of a crime, or can point toward the existence of evidence in other locations. Evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachments B-1 and B-2 also falls within the scope of the warrant.

52. In finding evidence of how a computer has been used, the purposes for which it was used, and who has used it, sometimes it is necessary to establish that a particular item is not present on a drive. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge. This software can allow a computer to be used by others. To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present on the computer, and, if so, whether the presence of that malicious software might explain the presence of other things found on the computer's hard drive.

53. Upon searching the SUBJECT ITEMS, law enforcement personnel trained in searching and seizing computer data will seize the computer equipment and transport it to an appropriate law enforcement laboratory for review. The computer equipment and storage devices, any search of, electronic media, on or off site will be performed by a review team in accordance and as defined by the review protocols described below in order to extract and seize any data that falls within the list of items

to be seized as set forth in Attachments B-1 and B-2.

54. In order to fully retrieve data from a computer system, the review team needs all electronic storage devices as well as the computer's central processing unit (CPU). As in this case where the evidence consists partly of graphic files, the monitor and printer are essential to show the nature and quality of the graphic images which the system could produce. In addition, the review team needs all the system software (operating systems or interfaces and hard drive drivers) and any application software which may have been used to create the data (whether stored on hard drives or on external media). Where there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem, hardware and software are all instrumentalities of the crime of receipt, possession, distribution, or transportation of child pornography in violation of federal law, they should also all be seized as such.

55. If the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items in a reasonable amount of time not to exceed 120 days from the date of seizure unless further authorization is obtained from the Court. Due to the review team protocols described below, the examination and evaluation of seized electronic devices is expected to take a considerable amount of time due to the limited forensic resources available.

56. No wire communications or electronic communications shall be intercepted during the execution of this search warrant. I have no information to indicate that the computer(s) to be searched operate in any way as a server of an electronic bulletin board service, Internet web site host, Internet file transfer protocol server, Internet chat server, or Internet email forwarder or server. As such, it would appear that the provisions of the Wire and Electronic Communications Interception Act, 18 U.S.C. Section 2510 et seq., do not apply. Should information of this type be discovered, the Government will preserve it and set it aside.

## X. <u>SPECIFIC METHODS FOR SEARCH OF DIGITAL DEVICES</u>

57. Your affiant is seeking authority to search for, among other things, electronic devices and other items containing digital data, more particularly described in Attachments B-1 and B-2. As many devices commonly found in a residence may contain digital data, your affiant will make every reasonable effort to minimize seizures to only those devices for which there is reason to believe might

be found: 1) evidence or fruits of the aforementioned crimes; 2) contraband implicated by this Affidavit; and 3) property/instrumentalities designed for use, intended for use, or used in the commission of the aforementioned crimes. If personnel trained in the forensic preview of digital evidence are available, and if doing so will not extend the duration of the search to an unreasonable time. Your affiant intends for there to be an on-scene preview of the digital evidence in order to minimize the amount of material which needs to be removed from the premises. Your affiant is aware that certain tools are available to trained personnel which make such previews possible under certain circumstances. Such a preview generally consists of reviewing images and videos contained on digital media, and searching for filenames which appear to contain references to child pornography. These previews are done in a manner which preserves the integrity of the data on the device. A forensic preview is not a substitute for a forensic examination, but in certain instances (such as when it is possible through interviews to determine which items belong to uninvolved third parties), an on-site forensic preview can be a useful tool in minimizing the number of digital devices that need to be removed from the premises for a full forensic examination. If an item which may reasonably contain evidence of child pornography cannot be eliminated from suspicion, your affiant intends to remove it to a laboratory setting for a more detailed forensic examination by the review team, in accordance with the parameters described below.

58. As previously mentioned, the search of a computer hard drive or other computer storage medium is a time-consuming manual process often requiring months of work. Your affiant is aware that the seizure of a computer hard drive, by necessity, provides the seizing agency with potential access to data outside the scope of this warrant. A search protocol will be utilized to uncover evidence, instrumentalities and contraband set forth in Attachments B-1 and B-2 for which there is probable cause. As part of the search protocol, your affiant intends to direct the review team to search any computer and computer storage medium for those items contained in Attachments B-1 and B-2. As it concerns this particular case, your affiant intends to direct the review team to search digital media with some or all of the following methods, not listed in any particular order; however, the listing of these methods is not a representation that these specific techniques will be employed in this case:

a) Data Carving: Your affiant is aware that, as previously mentioned, data residue

may be left in the "free," "unallocated," or "slack" space of a computer hard drive, that is, the space not currently used by active files. Your affiant is further aware that, as previously mentioned, many operating systems utilize temporary storage often referred to as "swap space" on the hard drive to store contents from main system memory. Such unallocated and swap space may contain the residue of files which can be carved out, often in an automated or semi-automated fashion. Your affiant intends to use forensic tools to carve out files, in particular, image files such as JPEG and GIF files. The mere act of carving out such files does not expose your affiant to the contents of such recovered files, but makes those files available for further relevancy checks, such as keyword searches (explained above) and hash value comparisons (explained below).

b) Hash Value Comparisons: Your affiant is aware that computer forensic utilities provide the capability to utilize a function known as a hash algorithm. A hash algorithm uses a mathematical formula to analyze the data composing a file, and to generate a unique "fingerprint" for that file. The act of hashing a piece of data does not reveal to an investigator any information about the contents of that data. However, your affiant is aware that computer forensic applications often contain databases of known hash values for files. Some of those files are "ignorable," which enables other forensic processes to ignore files (such as the Windows operating system) that are not evidentiary in nature. Some of the files are "alert" files, such as the Child Victim Identification Program (CVIP) hash set, that contains hash values for a small subset of the identified picture and video files for known victims of child pornography. CVIP alert files notify an examiner that a file appears to contain known depictions of child pornography. Your affiant seeks permission to utilize automated hash value comparisons to both exclude irrelevant files, and to locate known child pornography files. Hash value comparisons are useful, but not definitive, as even a single-bit change to a file will alter the hash value for the file. The forensic review team does not intend to rely solely on hash value comparisons, but intends to utilize them in order to assist with identifying relevant evidence. The use of this search method is intended to narrow the search. A search of known hash values, however, will not be used exclusively, because your affiant knows that when previously identified images of

child pornography are found on a target's computer, typically there are many more images of child pornography depicting unknown child victims. Using a hash value search method exclusively would not uncover these images of unknown child victims as well as other evidence authorized by this warrant and described in Attachments B-1 and B-2.

c) Opening Container Files, Encrypted Volumes, Embedded Files: Your affiant is aware that relevant data may be compressed, encrypted, or otherwise embedded in other files or volumes. It is often not possible through any automated process to examine the contents of such containers without opening them, just as it is not possible to examine the contents of a locked safe without first opening the safe. In the event that compressed, encrypted, or otherwise embedded files or volumes may exist on the seized items, your affiant intends to use sophisticated forensic tools to attempt to open any such container files which may reasonably contain evidence of child pornography.

d) File Header/Extension Checks: Your affiant is aware that individuals involved in illegal activities on a computer often change the extension of a file (such as .jpg) to some other incompatible extension (such as .txt) in order to disguise files from casual observers. The extension of a file, however, is not necessarily linked to the "header" of a file, which is a unique marking imbedded automatically in many types of files. By comparing the extension of a file with the "header information" of a file, it is possible to detect attempts to disguise evidence of illegal activities. Such a comparison can be made in an automated process by computer forensic tools. Your affiant intends to run an automated header comparison to detect such efforts, and intends to review any such files which reasonably may contain evidence of child pornography.

e) Thumbnail / Image Views: Although hash value comparisons can positively identify known child pornography depictions, a negative hash value comparison does not exclude an image from suspicion. There is no known alternative for visually inspecting each image file. Your affiant therefore intends to examine at least a thumbnail image of each image file on the digital media whether "live," data carved, or identified by header.

f) Registry / Log File Checks: Your affiant is aware that it is necessary in any criminal case to establish not only that a crime has occurred, but also to establish what person

committed that crime. Operating systems and computer programs often maintain various administrative files such as logs which contain information about user activities at certain times. In the Windows operating system, for example, some of these files are collectively referred to as "the registry." Such files contain specific information about users, often including email addresses used, passwords stored, and programs executed by a particular user. These files may also contain evidence regarding storage devices which have been connected to a computer at some time. Multiple backup copies of such files may exist on a single computer. Your affiant intends to examine these files to attempt to establish the identity of any user involved in the receipt, possession, distribution, and transportation of child pornography, and to establish methods (such as software used) and dates of this activity.

g) Metadata / Alternative Data Streams: Your affiant is aware that many file types, operating systems, and file systems have mechanisms for storing information which is not immediately visible to the end user without some effort. Metadata, for example, is data contained in a file which is not usually associated with the content of a file, but is often associated with the properties of the application or device which created that file. For example, a digital camera photograph often has hidden data which contains information identifying the camera which manufactured it, and the date the image was taken. Some file systems for computers also permit the storage of alternate data streams, whereby a file such as a text file may hide an image file which would not be immediately visible to an end user without some action taken. Your affiant is aware that both metadata and alternative data streams may contain information which may be relevant to child pornography offenses. Metadata and alternative data streams are often identified and processed automatically by computer forensic utilities. Your affiant intends to review any such data which is flagged by any process above as being relevant to the receipt, possession, distribution, and transportation of child pornography.

59. With rare exception, the above-listed search techniques will not be performed on original digital evidence. Instead, your affiant is aware that the first priority of a digital evidence forensic examination is the preservation of all data seized. As such, original digital media will be, wherever possible, copied, or "imaged," prior to the start of any search for evidence. The copy will be

authenticated digitally as described in the paragraph below.

60. Your affiant is aware that a digital forensic image is the best possible copy that can be obtained for a piece of digital media. Forensic imaging tools make an exact copy of every accessible piece of data on the original digital media. In general, the data contained on the original media is run through a hashing algorithm as described above, and a hash value for the entire device is generated. Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to ensure the copy is an exact duplicate of the original. Upon the completion of the search processes described above, which are performed on the image of the hard drive, the hash algorithm is again run on the image copy to insure no alterations of the data occurred during the examination process.

61. As previously mentioned, in the event that a piece of digital media is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible, not to exceed 120 days.

62. Your affiant also requests judicial authorization to retain copies of all seized storage media after the review is complete. Criminal Procedure Rule 41 specifically states "The officer may retain a copy of the electronically stored information that was seized or copied." Fed. R. Crim. P. 41 (f)(1)(B).

63. That Judicial authorization is justified in this case in part because:

a) Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media may be required to prove these facts and the investigator may retain a copy of seized or electronically stored information pursuant to Fed. R. Crim. P. 41(f)(1)(B).

b) Returning the original storage medium to its owner will not allow for the preservation of that evidence. Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

c) Because the investigation is not yet complete, it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used. That

evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Retention of a complete image assures that it will be available to all parties, including those known now and those later identified. Forensic analysis may identify the user names and screen names of those distributing child pornography to the user of the target computer(s).

d) The act of destroying or returning storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to her. Maintaining a copy of the storage medium would permit the government, through additional warrant if necessary, to investigate such a claim.

e) Similarly, should a defendant suggest an explanation for the presence of evidence on storage medium or some defense, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage medium with that explanation or defense in mind. This may require an additional examination of the storage medium for evidence that is described in Attachments B-1 and B-2 but was not properly identified and segregated previously.

64. Your affiant has not attempted to acquire the sought-after material through any other investigative or judicial process.

## XI. <u>REVIEW PROTOCOL FOR COMPUTERS</u>

Government personnel will utilize the following computer review protocol:

65. Contextual evidence that establishes how computers were used, the purpose of their use, and who used them is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, such evidence necessary to understand the evidence described in Attachments B-1 and B-2 is included within the scope of this warrant and will seized.

66. Although it is not possible to accurately predict the exact composition of the review team, given the very limited computer forensic examination resources available at present, it is possible that the team may include one or more agents, computer specialists, analysts, and/or attorneys including members of the investigative team. The team will not necessarily consist only of persons with those job

descriptions, and by referencing those job descriptions, this affiant does not intend to represent anything about the manner in which the team will conduct its review. It is also possible that the review "team" will consist of a single person.

67. Based on my knowledge, training, and experience in child exploitation and child pornography investigations and other investigation, and the experience and training of other law enforcement officers with whom I have had discussions, I know that when searching and seizing evidence from computers, agents commonly download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer-related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. The latter approach is more typical for the following two reasons:

a) The large storage capacity of modern digital storage devices assists in the concealment of criminal evidence, especially when the user camouflages digital files in the way they are named or stored. Sorting criminal evidence from innocuous data may thus take days or weeks, depending upon the volume of data stored, and is generally difficult to accomplish on-site. Also, some information on the computer may only make sense in the context of other information that must be analyzed with it. For example, an apparently meaningless series of letters and numbers may only be recognized as a password when described as such by another document, such as an email.

b) Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in particular systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Because computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

68. To fully retrieve data from a computer system, a computer forensic analyst needs all magnetic storage devices as well as the central processing unit ("CPU"). In cases involving CSAM, where the evidence typically includes graphics files, the user's monitor may be essential for a thorough and efficient search due to software and hardware configuration issues. Other elements of the computer, such as keyboards, mice, cables, and power cords, are necessary in order to ensure that the computer will continue to function in a laboratory environment. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may be used to create the data (whether stored on hard drives or on external media).

69. In case any data on the computer or other devices is encrypted, password-protected, or booby-trapped, a forensic analyst would require any documentation or notes describing password-protection or encryption software used on the computer, or listing passwords and usernames.

70. Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is likely that THOMAS had control, custody, or access to the computers or storage media and the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well. Reasonable efforts will be made to triage computers and storage media devices on scene during the execution of the search warrant, to determine whether it is likely that THOMAS had access to them. Once a forensic review determines that there is no evidence of the suspected crimes on a computer or storage media, reasonable efforts will be made to return the items to their owners.

## XII. AUTHORIZATION REQUEST WITH REGARD TO THE SEARCH OF THOMAS'S PERSON AND RESIDENCE

71. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

72. I further request that the Court order that all papers in support of this application, including the Affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the

investigation. In addition, in the Discord communication included above, THOMAS expresses shame and concern for her interest in CSAM. Premature public disclosure of this investigation could cause her to destroy evidence, flee to avoid prosecution, or harm herself. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.

## XIII. AUTHORIZATION REQUEST REGARDING APPLICATION FOR WARRANT TO OBTAIN PRECISE LOCATION DATA FROM A CELLULAR PHONE

The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is the Eastern District of California, a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

73. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

74. Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer

connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

75. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

76. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachments B-1 and B-2 that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachments B-1 and B-2 unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

77. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

78. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

79. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachments B-1 & B-2 that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachments B-1 and B-2 unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for

reasonable expenses incurred in furnishing such facilities or assistance.

## XIV. CONCLUSION

80. Based on the foregoing, I submit there is probable cause to believe that on or about June 21, 2026, in the Eastern District of California, THOMAS knowingly distributed visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2). I further request that the Court order that all papers in support of this application, including the Affidavit and complaint, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. In addition, in the Discord communication included above, THOMAS expresses shame and concern for her interest in CSAM. Premature public disclosure of this investigation could cause her to destroy evidence, flee to avoid prosecution, or harm herself. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.

81. I also request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41, for the person and property further described in Attachments A-1 and A-2, for the items described in Attachment B-1 and B-2.

//

//

//

//

//

//

//

82. Finally, I also submit there is probable cause to obtain the information about the location of the Target Cell Phone, described herein and in Attachment A-3, and the location information to be seized is described herein and in Attachment B-3.

Respectfully submitted,

/s/

Casey J. Snyder
Special Agent
Homeland Security Investigations

Subscribed and sworn to me telephonically on: September 24, 2026

Hon. Chi Soo Kim
U.S. MAGISTRATE JUDGE

/s/ Adrian T. Kinsella
Approved as to form by AUSAs ADRIAN T. KINSELLA and ZACHARY RAY

In addition, with respect to the warrant to obtain prospective location data for the Target Cell Phone, to ensure technical compliance with 18 U.S.C. §§ 3121-3127, I also request that this warrant shall also function as a pen register order. I thus certify that the information, under oath, that likely to be obtained is relevant to an ongoing criminal investigation conducted by the Homeland Security Investigations, based on the agent's Affidavit herein. *See* 18 U.S.C. §§ 3122(b), 3123(b).

**United States v. Jayden Virgil Thomas**
**Penalties for Criminal Complaint**

VIOLATION: 18 U.S.C. § 2252(a)(2) – Distribution of Child Pornography

PENALTIES: Mandatory minimum of 5 years in prison and up to 20 years in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of at least 5 years and up to life
Restitution

SPECIAL ASSESSMENTS:
$100, pursuant to 18 U.S.C. § 3013;
$5,000 if the defendant is non-indigent, pursuant to 18 U.S.C. § 3014(a)(3); and
Up to $35,000, pursuant to 18 U.S.C. § 2259A